**Ronni RABIN, et al., Plaintiffs,**

**v.**

**Patricia WILSON–COKER, in her official capacity as Commissioner of the State of Connecticut Department of Social Services, Defendant.**

No. 3:03–CV–555 RNC.

United States District Court, D. Connecticut.

May 29, 2003.

Gregory Lee Bass, Lucy Potter, Greater Hartford Legal Aid, Hartford, CT, Shelley A. White, Joanne G. Gibau, New Haven Legal Assistance, New Haven, CT, Sharon D. Langer, Connecticut Legal Services, New Britain, CT, for Plaintiffs.

Hugh Barber, Richard J. Lynch, Tanya Feliciano, Attorney General's Office Health & Human Services, Hartford, CT, for Defendant.

### RULING AND ORDER

CHATIGNY, District Judge.

This litigation stems from budget deficit reduction legislation approved by the Connecticut General Assembly in February 2003, known as Public Act 03–02. Among other budget-cutting measures, the General Assembly undertook to reduce the State's Medicaid expenditures effective April 1 by tightening income eligibility limits for certain adults and eliminating one form of continuous eligibility coverage for children. In March, plaintiffs brought this action pursuant to 42 U.S.C. § 1983 to prevent termination of their Medicaid benefits by the Department of Social Services, the state agency responsible for administering the Medicaid program. Their request for a temporary restraining order was granted at the end of March, and they now seek a preliminary injunction. They concede that federal law gives states flexibility to reduce Medicaid spending by lowering income eligibility limits, as the General Assembly has done in this instance, but contend that they are entitled to transitional medical assistance, or "TMA," pursuant to 42 U.S.C. §§ 1396u–1(c)(2) and 1396r–6.[1] In addition, they claim that a person's Medicaid coverage may not be terminated until the Department has determined, after an individualized ex parte review, that the person does not qualify for coverage under any eligibility category. The Department denies that federal law

---

1. TMA allows some individuals who have become ineligible for Medicaid benefits to continue to receive those benefits for up to one year in order to assure that they do not immediately lose coverage. *See* discussion *infra* Part II.A.

entitles plaintiffs to sue for, or obtain, either form of relief. For reasons discussed below, I conclude that even assuming plaintiffs have a right to sue for TMA under § 1983, they are not entitled to it. I also conclude that plaintiffs have a right to sue to retain their coverage until the Department finds that they no longer qualify, but that they do not have a right to the ex parte review they seek and that the Department's ongoing process for making eligibility findings complies with federal requirements. Accordingly, the motion for a preliminary injunction is denied, and the motion for summary judgment is granted.[2]

## I. FACTS

The Medicaid program, codified in Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v, provides access to health care for individuals who have little or no money. Medicaid pays for doctor visits, hospital care, nursing home care, prescription drugs and other health care expenses. The program is administered by the states in accordance with federal regulations. Participating states can obtain reimbursement from the federal government for fifty per cent or more of their Medicaid budgets. To qualify for reimbursement, a state must provide "plan assurances" to the Center for Medicare and Medicaid Services ("CMS") detailing how its plan meets federal requirements.

Connecticut provides Medicaid coverage to people in various categories of eligibility, including children under the age of nineteen, women who are pregnant, people over the age of sixty-five, and persons with certain disabilities. See Conn. Gen.Stat. §§ 17b–257, et. seq. Two parts of Connecticut's Medicaid program are relevant to this action: the HUSKY Plan, Part A,[3] Conn. Gen.Stat. § 17b–261 ("HUSKY A"), a managed-care health insurance program for low-income families with children under nineteen; and Continuous Eligibility for Children ("CE"), Conn. Gen.Stat. § 17b–292(d), repealed by P.A. 03–02 (2003).

HUSKY A provides health insurance coverage to families that meet income eligibility limits. This coverage group corresponds to the group of people who qualify for coverage under section 1931 of the Social Security Act, 42 U.S.C. § 1396u–1, which requires states to provide medical assistance to families with minimal income. See 42 U.S.C. § 1396u–1(b)(1)(A). Federal law gives states flexibility to extend this coverage to more families. 42 U.S.C. § 1396u–1(b)(2). In 2001, the General Assembly made use of this option to extend HUSKY A benefits to adults and children with family income up to 150% of the federal poverty level. Conn. Gen.Stat. § 17b–261(a).

Section 10 of Public Act 03–02 repeals this provision and replaces it with a new statute that lowers the HUSKY A income eligibility limit for adults from 150% to 100% of the federal poverty level.[4] In addition, Public Act 03–02 eliminates the continuous eligibility coverage group for children. P.A. 03–02 § 7.

---

**2.** Plaintiffs' request for more time to respond to the summary judgment motion is denied. The issues have been briefed and argued and there appears to be no need for further briefing.

**3.** HUSKY stands for Healthcare for Unin-Sured Kids and Youth.

**4.** The new § 17–261 provides:

(g) Notwithstanding the provisions of subsection (a), on or after April 1, 2003, all parent and needy [caregiver] relatives with incomes exceeding one hundred per cent of the federal poverty level, who are receiving medical assistance pursuant to this section, shall be ineligible for such medical assistance.

The Department is responsible for implementing the coverage changes required by the General Assembly. In March, it sent notices to adults enrolled in HUSKY A notifying them that effective April 1 they would no longer qualify for coverage because of the new income eligibility limit of 100% of the federal poverty level. The Department also sent notices to adults with children affected by the elimination of the continuous eligibility coverage group.

The named plaintiffs received notices from the Department informing them that they were going to lose their Medicaid coverage. They then brought this § 1983 action on behalf of themselves and 30,000 others facing termination of their Medicaid benefits as a result of the new law. The putative class consists of 23,000 HUSKY A adult recipients and 7,000 children in the group covered by CE.

On March 31, plaintiffs' request for a temporary restraining order preventing the Department from terminating their benefits was granted on the ground that, as the Department acknowledged, the termination notices sent to the plaintiffs failed to fully comply with federal requirements.

A number of developments have occurred since the restraining order was issued:

(1) The Department has used various means to identify HUSKY A and CE beneficiaries who might qualify for Medicaid under other coverage categories because of pregnancy, age, or disability.[5] The Department concedes that this process is imperfect and may lead to eligible individuals losing coverage.[6]

(2) The Department has agreed to issue a new notice to all affected individuals. The notice will inform them that they have a right to request a hearing; if they request a hearing they will continue to receive benefits until at least the hearing date; they may qualify for Medicaid under another eligibility category, each of which is described; and they should call their case worker if they believe they may continue to qualify.[7] And,

---

5. The Department has searched its files and contacted managed care organizations for information indicating that a HUSKY A adult might be eligible for coverage based on pregnancy. As a result of this process, at least 141 women have been reassigned to that eligibility category. The Department has also searched its files to identify HUSKY A recipients over age 65, who might qualify for continued coverage based on age, medical expenses, blindness or disability, and has contacted them in writing to determine if they qualify. At least 160 adults have been reassigned to another coverage group as a result. Similar steps have been taken by the Department to identify CE enrollees who might qualify for continued coverage. As a result of that process, approximately 660 children have been placed in other coverage groups.

6. This risk is illustrated by the case of Shantel Wells, a CE recipient who moved to intervene in this action to avoid loss of coverage. As a result of her motion, the Department reviewed her file and determined that she remains eligible for coverage under a different category.

7. The notice to individuals who appear to be ineligible for HUSKY A as a result of the new law will state, in pertinent part:

The adults in your family are not eligible for HUSKY effective [June 30, 2003].

The adults in your home *could* still be eligible for Medicaid even if your family income is above 100% of the federal poverty level. Pregnant women are still eligible for HUSKY. Also, disabled adults and families with child care expenses or high medical expenses may qualify for Medicaid. Women who were screened by the Center for Disease Control and Prevention's Breast and Cervical Cancer Early Detection program may also qualify for Medicaid. We have *no* information that the adults in your house are eligible for Medicaid for one of these reasons. . . .

If you think we have made a mistake [in calculating your income], call your worker

(3) The Department has extended the benefits termination date until July 1. As a result, the named plaintiffs and putative class members will continue to have coverage until then.

The preliminary injunction plaintiffs seek would require the Department to provide them with TMA and restrain it from terminating the Medicaid coverage of any person who has not been given the benefit of an individualized coverage review.[8] The review plaintiffs seek would require the Department to search the file of each person losing coverage as a result of the new law for information relating to the individual's potential eligibility for coverage under a different category. If a file proved to contain sufficient information to enable the Department to reassign the person to another coverage group, that would be done. Otherwise, the Department would be obliged to contact the person to obtain information relevant to eligibility before terminating the person's coverage. It is undisputed that this individualized coverage review would take a minimum of 30 minutes per file, requiring the Department to spend at least 15,000 hours reviewing the eligibility of the 30,000 putative class members. This means that if the Department undertook to complete the review

process in four weeks, it would have to assign approximately 100 employees to work on the project full-time.

The main difference between plaintiffs' review process and the Department's is the requirement of an individualized file review before the Department sends recipients the new notice requesting information regarding eligibility. Plaintiffs' concern is that eligible individuals who have previously provided the requested information will not respond to the new notice, and thus lose coverage, because they will assume that the Department has reviewed the information and found them ineligible when in fact no such finding will have been made.

Plaintiffs contend that the putative class includes people who may be unable to read, comprehend and comply with the Department's notice. However, the evidence is insufficient to permit findings concerning this risk. Plaintiffs do not dispute that federal law permits the Department to communicate with Medicaid beneficiaries by means of written notices. Nor do they dispute that federal law permits the Department to rely on beneficiaries to respond to notices and provide information regarding eligibility.

right away. You should also call your worker, if you have income under the limits, or you are pregnant, disabled, have high medical expenses, child care expenses, or you have breast or cervical cancer.

The notice to children who will lose eligibility as a result of the termination of the CE program will contain all similar relevant information.

It is the court's understanding that if an individual calls a caseworker in response to the new notice, she will continue to be insured until the Department reviews her file to determine whether she qualifies for coverage under a different eligibility category.

8. On May 12, while the parties' motions were under advisement, the General Assembly

amended § 17b–261 to include the following provision:

(g) To the extent permitted by federal law, Medicaid eligibility shall be extended for two years to a family who becomes ineligible for medical assistance under Section 1931 of the Social Security Act while employed or due to receipt of child support income or a family with an adult who, within six months of becoming eligible under Section 1931 of the Social Security Act becomes employed.

This provision, which is due to become effective October 1, is regarded by the Department as technical in nature and thus irrelevant to the issues presented by the parties' motions.

## II. DISCUSSION

■ To obtain a preliminary injunction, plaintiffs must first demonstrate that the injunction is necessary to prevent irreparable harm. *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir.1997). They satisfy this requirement because termination of benefits causing loss of access to necessary medical care constitutes irreparable harm. *See, e.g., Harris v. Blue Cross Blue Shield of Missouri*, 995 F.2d 877, 879 (8th Cir.1993); *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir.1983).

· ■ Plaintiffs must also show either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to create a fair ground for litigation and a balance of hardships tipping decidedly in their favor. *Phillip*, 118 F.3d at 133. As a general rule, courts will not enjoin state action taken in the public interest pursuant to a statute unless the applicant demonstrates a "likelihood of success," but the less restrictive showing may be sufficient in some instances. *See Time Warner Cable of New York v. Bloomberg*, 118 F.3d 917, 923 (2d Cir. 1997). The parties dispute which standard should be applied. Resolving this dispute is unnecessary because it has no bearing on the outcome.

To obtain summary judgment, the Department must show that the evidence, viewed fully and most favorably to plaintiffs, is legally insufficient to support their claims and that it is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c).

### A. Eligibility for TMA

■ Federal law entitles Medicaid enrollees to receive TMA if they become ineligible for coverage "because of . . . income from employment." 42 U.S.C. § 1396u–1(c)(2). Plaintiffs contend that this provision requires the Department to provide TMA to adults who lose coverage as result of the lowering of the HUSKY A income eligibility limit from 150% to 100% of the federal poverty level. The Department responds that plaintiffs do not have a right to sue to enforce this provision under § 1983 and that, even if they do, their loss of coverage resulting from the General Assembly's decision to reduce Medicaid expenditures does not entitle them to TMA. Assuming without deciding that the named plaintiffs have a right to sue under § 1983 to obtain TMA, they are not entitled to injunctive relief.

Under the TMA provision, anyone who "become[s] ineligible because of . . . income from employment" is entitled to TMA. 42 U.S.C. § 1396u–1(c)(2), referring to § 1396r–6. People who lose eligibility for reasons other than "income from employment" do not qualify.

The statutory phrase "become[s] ineligible because of . . . income from employment" is ambiguous. It could apply to plaintiffs, who cease to be eligible because their income exceeds the new HUSKY A income eligibility limit established by Public Act 03–02. Alternatively, it may apply only if the triggering event causing a loss in eligibility is an increase in income, a condition that was explicitly stated in the predecessor statute to §§ 1396u–1(c)(2) and 1396r–6.[9]

---

**9.** The predecessor statute, 42 U.S.C. § 1396a(e)(1), has not been repealed, but its application has been suspended. *See* 42 U.S.C. § 1396a(e)(2). The Department argues that § 1396a(e)(1) should apply to this case because § 1396r–6 is no longer in effect.

42 U.S.C. § 1396r06(f). However, Congress has issued a series of continuing budget resolutions extending the applicability of § 1396r–6 until June 30, 2003. Pub.L. 107–229, § 7; Pub.L. 107–240, § 3; Pub.L. 107–294, § 2; and Pub.L. 108–7, § 401.

Because the terms of the statute are ambiguous, it is necessary to consider the statute's legislative history and purpose, as well as the interpretation of the federal agency charged with administering the Medicaid program, CMS. When these guides to Congressional intent are considered, it becomes apparent that plaintiffs' interpretation of the statute cannot be sustained and that the Department's interpretation is correct.

The legislative history strongly supports the Department's interpretation. The House Report on the pertinent bill states more than once that TMA would be provided to persons losing eligibility for Medicaid due to "increased income," which was the existing law. *See* H. Rep. No. 104–651, p. 352, 1322, and 1351, reprinted in Vol. V, 1996 U.S.C.C.A.N. 2183, 2265, 2381, and 2410. This position was adopted in Conference without further comment. H. Conf. Rep. No. 104–725, p. 290–292, 299, reprinted in Vol. V, 1996 U.S.C.C.A.N. 2649, 2678–2680, 2687.[10]

Plaintiffs rest their claim on the disappearance of the word "increased" as a modifier of the word "income" in the text of the statute. They contend that because the word "increased" appeared in the previous version but does not appear in the current one, Congress must have intended to guarantee TMA to people whose ineligibility for Medicaid coverage stems from something other than an increase in income from employment. *See Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion

or exclusion."). If plaintiffs are correct, they are entitled to TMA, although their employment income remains unchanged, because their ineligibility for Medicaid coverage derives at least in part from employment income, which puts them over the new income eligibility limit.

Viewing the legislative history in its entirety, it is clear that the absence of the word "increased" from the current version of the statute does not signal a change in the substance of the law. If the disappearance of the word "increased" from the statute reflected a decision to change the law to guarantee TMA to persons who lose eligibility for Medicaid due to a lowering of income eligibility limits, as plaintiffs contend, one would expect to find some mention of it in the legislative history, yet no mention of it can be found. Instead, whenever the TMA provision is discussed in the House and Senate Reports, one finds the word "increased" prominently modifying the word "income." This is clear evidence that Congress intended to leave the substance of the TMA provision unchanged. Furthermore, Congress's apparent belief that the word "increased" could be dropped without producing a substantive change is reflected in a section of the House Report where the word "increased" appears in the title of the section but not in the text. H. Rep. No. 104–651, p. 1351, reprinted in Vol. V, 1996 U.S.C.C.A.N. 2183, 2410. In light of the House and Conference Reports, it is apparent the word "increased" was not deliberately carved out of the statute in order to change the law. *See In re International Judicial Assistance* 936 F.2d 702, 706 (2d Cir.1991) (suggesting that the deletion of a word may have been inadvertent).[11]

---

**10.** The Senate bill reflected the previous law, which, according to the Conference Report, provided for TMA only in the case of "increased income." *Id.*

**11.** It would not be appropriate to ignore the

In considering which side's reading of the statute gives effect to Congress's purposes, the available evidence again strongly favors the Department. According to the House Report, the overarching goals of welfare reform, of which the TMA provision is a part, are to (1) provide healthcare to the most needy, (2) control healthcare expenditures, (3) provide states with maximum flexibility in designing Medicaid programs, and (4) protect states from unanticipated costs resulting from changes in the business cycle. *See* H. Rep. No. 104–651, p. 350, reprinted in Vol. V, 1996 U.S.C.C.A.N. 2183, 2263. The Department's reading of the statute is consistent with each of these purposes. Plaintiffs' reading, on the other hand, would significantly restrict the states' ability to reduce costs in response to budget deficits by mandating continued coverage for people who are not among the most needy by federal standards.

The Department's position is also consistent with the main purpose of TMA, which is to assure people that if they go to work, or their salaries increase, they will not lose their health insurance coverage. *Id.* at 2411. It is possible that when a state lowers an income eligibility limit to reduce Medicaid expenditures, some of the affected individuals may stop working to avoid losing benefits, but there is no indication Congress intended to require states confronted with budget deficits to provide TMA to persons in that situation in order to encourage them to keep working. Nor is there any evidence in the record to support a finding that the coverage change mandated by the General Assembly will result in people leaving the workforce in order to remain insured.

CMS's interpretation of the statute also supports the Department's position.[12] CMS publishes the State Medicaid Manual, which constitutes its most authoritative interpretation of the Medicaid statutes short of a formal regulation. The Manual expressly provides that TMA is available only to persons who lose eligibility for Medicaid as a result of an increase in income from employment. *See* Manual §§ 3308.3 and 3308.13. These provisions are described in the Manual as "tentative interpretations of the statute" and "advisory only," but they still give the best indication of how CMS interprets the statute. In addition, Connecticut's CMS-approved state plan and an advisory letter from CMS to state Medicaid directors state that TMA benefits are provided only when beneficiaries lose coverage as a result of increased income.

Given the text of the statute, its legislative history, the four stated purposes of welfare reform, the specific purpose of TMA, and CMS's consistent interpretation of the statute, Congress's intent is clear: the Department must provide TMA to persons losing eligibility for Medicaid due to an increase in income from employment, but not to persons losing eligibility only because of a change in the income eligibility limit.[13] *But see White v. Martin,* No.

---

absence of the word "increased" and read the statute as if the word were still there. *Id.* at 705. However, as explained above, the absence of the word "increased" renders the statute ambiguous; it does not compel the conclusion that TMA must be given to persons losing coverage due to a lowering of the income eligibility limit.

**12.** CMS's interpretation of Title XIX is entitled to deference. *DeSario v. Thomas,* 139 F.3d 80, 89 (2d Cir.1998).

**13.** The Department also argues that plaintiffs are not entitled to TMA because their income exceeds the federal income eligibility limit. *See Kai v. Ross,* No. 4:03CV3030 (D.Ne. March 4, 2003) (applying the federal minimum requirement in determining plaintiffs' right to TMA). This argument need not be

02–4154–CV–C–NKL (W.D.Mo. filed Oct. 3, 2002).[14]

B. *Individualized Ex Parte Review*

Plaintiffs claim that a person's Medicaid coverage may not be terminated unless an individualized ex parte review by the Department leads to a finding that she does not qualify for coverage under any eligibility category. This claim rests on 42 U.S.C. § 1396a(a)(8), as implemented by 42 C.F.R. § 435.930(b).[15] Under the former, a state's Medicaid plan must provide that "assistance . . . shall be furnished with reasonable promptness to all eligible individuals"; under the latter, a state must "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible[.]" The Department contends that plaintiffs have no right to sue to enforce either of these provisions, nor any right to continued coverage pending the outcome of an individualized ex parte review. I agree with plaintiffs that the statute and regulation confer an enforceable right to receive benefits without interruption until a finding of ineligibility is made. However, I do not agree that an individualized ex parte review necessarily must precede such a finding. In addition, I conclude that in the circumstances shown by the record, the Department's ongoing review process complies with federal law.

 Section 1983 provides a cause of action against state officials for violation of federal statutory rights if Congress's in-

tent to permit private enforcement actions is clear and unmistakable. *See Gonzaga University v. Doe*, 536 U.S. 273, 283 and 289, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Taylor v. Vermont Dept. Of Educ.*, 313 F.3d 768, 783 (2002). A statute creates a right that may be enforced under § 1983 if (1) Congress intended the provision to benefit the plaintiff; (2) the asserted right is not so vague and amorphous as to be judicially unenforceable; and (3) the statute unambiguously imposes a binding obligation on the states. *See Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

The statutory provision on which plaintiffs rely plainly satisfies each part of this test: (1) it is clearly aimed at benefitting all persons who want to receive Medicaid under a state plan, a class of beneficiaries to which plaintiffs belong; (2) its directive that all eligible individuals receive Medicaid with reasonable promptness is not so vague as to defy judicial enforcement; and (3) it unambiguously imposes a binding obligation on state Medicaid agencies to provide assistance with reasonable promptness. Because all three parts of the test are satisfied, it must be presumed that an eligible individual's right to receive Medicaid is enforceable under § 1983 unless Congress has explicitly foreclosed private enforcement actions or implicitly supplanted them by establishing a comprehensive administrative enforcement scheme. *See Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. It is undisputed that

addressed because the Department prevails on other grounds.

**14.** Construing the TMA statute in *White*, the court relied heavily on the absence of the word "increased" from the current version of the statute to find that it unambiguously requires states to give TMA to persons who lose coverage due to changes in income eligibility limits.

**15.** Plaintiffs also claim that the ex parte review they describe is required by the Due Process Clause of the Fourteenth Amendment. They cite no case supporting their due process claim and none has been found. Moreover, on the existing record, the Department's notice and hearing procedure appears to satisfy the requirements of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

no such scheme bars plaintiffs from suing the Department for noncompliance with this statutory provision.

Before the Welfare Reform Act was passed, courts recognized that provisions of the Medicaid Act can confer rights that are enforceable under § 1983. *See Wilder v. Virginia Hosp. Assoc.,* 496 U.S. 498, 511–12, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Massachusetts Ass'n of Older Americans v. Sharp,* 700 F.2d 749 (1st Cir.1983); *Stenson v. Blum,* 476 F.Supp. 1331 (S.D.N.Y.1979). The House Report to the Welfare Reform Act notes that under the law then in effect, including the provision on which plaintiffs rely, Medicaid beneficiaries could sue to enforce certain rights. *See* H. Rep. No. 104–651, p.2019, reprinted in Vol. V, 1996 U.S.C.C.A.N. 2183, 2616. The Report also shows that Congress considered a proposal that would have stripped Medicaid beneficiaries of a right to sue in federal court under § 1983,[16] but the law as enacted contains no such stripping provision. This indicates that Congress chose not to disturb the right to sue that beneficiaries were understood to have under prior law. Accordingly, I conclude that the statute on which plaintiffs rely provides the basis for an action under § 1983. *See Bryson v. Shumway,* 308 F.3d 79, 88–89 (2002); *White v. Martin,* No. 02–4154–CV–C–NKL (W.D.Mo. filed Oct. 3, 2002). *But see Sabree v. Houston,* 2003 WL 342237 (E.D.Pa. Jan.17, 2003) (concluding that 42 U.S.C. § 1396a(a)(8) does not create individual rights).

■ Plaintiffs' reliance on 42 C.F.R. § 435.930(b) raises the issue whether a regulation can provide the basis for a cause of action against state officials under § 1983. The Second Circuit has not ruled on this issue, and other courts are split. *See Smith v. Palmer,* 24 F.Supp.2d 955, 962 (N.D.Iowa 1998) (citing conflicting authorities). In *Harris v. James,* 127 F.3d 993, 1009 (11th Cir.1997), the Eleventh Circuit held that a regulation does not create a federal right for purposes of § 1983 unless it "defines or fleshes out" the content of an enforceable right contained in the governing statute. I agree with this approach. *See also Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987) (regulation not enforceable under § 1983 unless it implements right that is explicit or implicit in governing statute); *Smith v. Palmer,* 24 F.Supp.2d at 963 (mandatory language contained in implementing regulation alone is insufficient to create federally protected right); *Graus v. Kaladjian,* 2 F.Supp.2d 540, 543 (S.D.N.Y.1998) ("[O]nly [ ] those regulations that further define the substance of a statutory ... provision that itself creates an enforceable right [are enforceable through a § 1983 action].").

In this case, the regulation goes beyond the text of the statute by requiring states to continue to provide benefits until the individual is found ineligible. However, this requirement is implicit in the statute, for Congress surely intended to require states to provide benefits to eligible individuals without interruption. Therefore, the right to continued coverage in the absence of a finding of ineligibility is enforceable under § 1983.[17]

---

16. *Id.* ("[T]he bill explicitly prohibits any person from trying to enforce any such guarantee against a State in Federal Court.")

17. Whether the finding of ineligibility must encompass all coverage categories, as plaintiffs contend, or only the one under which the individual has been receiving coverage, as the Department seems to contend, appears to be a novel issue. It is unnecessary to rule on this issue because, as discussed below, even assuming plaintiffs' position is correct, the Department's procedure is sufficient.

Because plaintiffs have an enforceable right to remain insured until they are found to be ineligible, their request for expedited relief requires careful consideration. They contend that a person in their position is entitled to remain insured, and not be contacted, until the Department, after reviewing her file, finds that it needs more information to determine if she qualifies for coverage under other eligibility categories, at which point it would contact the person directly to obtain the relevant information. They claim that the Department should not be permitted to contact them by means of a class-wide notice asking for information they might have given the Department in the past on the ground that such a request could lead to confusion.

In support of their position, plaintiffs rely on two cases in which courts found that an ex parte review process was required, *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir.1983) and *Stenson v. Blum*, 476 F.Supp. 1331 (S.D.N.Y.1979). The issue in those cases was whether a state could terminate a person's benefits without making any finding concerning the person's eligibility under other categories, and leave it up to the person to reapply. *Massachusetts Ass'n of Older Americans*, 700 F.2d at 751; *Stenson* at 1333. In fact, in one of these cases the state required beneficiaries to reapply in circumstances where the vast majority of them undoubtedly would be eligible for continued coverage. *Massachusetts Ass'n of Older Americans*, 700 F.2d at 751–753. In the present case, by contrast, the Department's request for information is a further step in an ongoing effort to comply with the General Assembly's mandate to reduce expenditures ef-

fective April 1, while also identifying among the tens of thousands of persons affected by the change in the law anyone who might qualify for coverage under other categories in order to avoid interrupting their coverage.

Plaintiffs also rely on advisory letters issued by CMS before the enactment of Public Law 03–02. The first letter, apparently issued to each state participating in the Medicaid program, directed the Department to adopt an ex parte review procedure. The second, issued in the form of a report compiled after CMS reviewed the Department's procedures, concluded that Connecticut did not have such a procedure in place, and urged the Department to institute one. These letters are relevant to the present dispute, and entitled to some weight in the analysis, but it is far from clear that CMS would require the Department to spend 15,000 hours reviewing 30,000 files in order to avoid the risk of confusion that has been alleged. Even if CMS were to take the position that such an ex parte review process must be conducted, its opinion would not be dispositive, for there is no evidence that Congress itself intended to impose such a requirement.[18]

Medicaid beneficiaries are required to provide information affecting their eligibility. *See* 42 C.F.R. § 435.916(b) (The Department must have "procedures designed to ensure that recipients make timely and accurate reports of any change in the circumstances that may affect their eligibility."). There is no authority for the proposition that Congress intended to preclude a state agency from asking beneficiaries for eligibility information without first reviewing each one's file. Even assuming Congress intended to require state agencies to

---

18. Congress explicitly required state plans to provide ex parte reviews in some cases. 42 U.S.C. §§ 1396a(e)(10)(B) and 1396r–6(b)(3). It is undisputed that these provisions do not apply to this case.

conduct such a review before contacting a beneficiary in the ordinary course of administering the Medicaid program, there is no reason to think it intended to require an agency faced with a need to make coverage determinations with regard to tens of thousands of insureds to conduct a file-by-file ex parte review rather than simply send a notice to the insureds explaining the situation and urging them to contact their caseworkers.

Plaintiffs' primary concern, as noted earlier, is that HUSKY A adults who have previously provided the Department with information relevant to eligibility under other categories will not provide it a second time in response to the Department's new notice. This concern is adequately addressed by the Department's statement in the new notice that it has no information about pregnancy, disability, and other eligibility criteria, and by its advice to recipients that they should call their caseworkers if their income has been miscalculated or they are pregnant, disabled, have high medical expenses, child care expenses, or breast or cervical cancer. If a person fails to respond to this notice, and the Department has no particular reason to believe that she is unable to read, understand or comply with the notice, the Department may reasonably infer that she does not qualify for coverage under any category and therefore terminate her coverage without violating federal law.

III. *Conclusion*

Accordingly, it is hereby ordered that plaintiffs' motion for a preliminary injunction is denied, defendant's motion for summary judgment is granted, and the complaint is dismissed.

So ordered.